IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
IN AND FOR SEMINOLE COUNTY, FLORIDA

BEATRICE LLANIO,

       Plaintiff,

vs.

ASSOCIATED COST ENGINEERS,
INC, JAJA WADE, individually,
MARLO DICKENS, and
FAIRWINDS CREDIT UNION.

       Defendants,

CASE NO.: 08-CA-8379-09-W

_____/

## COMPLAINT

Plaintiff, BEATRICE LLANIO, sues Defendants, ASSOCIATED COST ENGINEERS, INC., JAJA WADE, individually, MARLO DICKENS, and FAIRWINDS CREDIT UNION, and alleges:

## GENERAL FACTUAL ALLEGATIONS

1. This is an action for damages in excess of Fifteen Thousand Dollars ($15,000.00).

2. Plaintiff resides at 1004 Oak Lane, Apopka, Orange County, Florida.

3. Defendant, ASSOCIATED COST ENGINEERS, INC., (ACE) is a Delaware Corporation that is authorized to do and is doing business in the State of Florida.

4. Defendant, JAJA WADE, (WADE) is, and at all times mentioned in this complaint was, the President of ACE.

5. Defendant, MARLO DICKENS, (DICKENS) is, and at all times mentioned in this complaint was, the owner of General Contractor's License, CGC#1508444. Upon

Information and believe, DICKENS permitted ACE and/or WADE to contract for general construction business using DICKENS' General Contractor's License, CGC#1508444.

6.   Defendant, FAIRWINDS CREDIT UNION (FAIRWINDS) is a Corporation that is authorized to do and is doing business in the State of Florida.

7.   On July 27, 2007, Plaintiff contracted for Defendants ACE and WADE'S General Contractor services for the demolition, renovation and addition to Plaintiff's residence, referred to in this complaint as "the project," to be constructed on Plaintiff's property.  A copy of the contract is attached and marked Exhibit "A."

8.   The project was to be constructed according to architectural and engineering specifications provided to the Defendants ACE and WADE by Plaintiff's architect.  A copy of the architect's specifications is attached and marked Exhibit "B."

9.   As consideration for Defendants ACE and WADE'S services, Plaintiff agreed to pay Defendants ACE and WADE the sum of $193,112.00, to be paid according to the lender's, FAIRWINDS, draw schedule.  A copy of the FAIRWINDS's draw schedule is attached and marked Exhibit "C."

10.   Final payment on the project was due and payable upon final invoice for all work under the contract.

11.   The contract provides that the services by Defendants ACE and WADE would comply with the specifications set out in the contract, and would be performed according to accepted standards of care of similar licensed contractors doing business in Orange County, Florida.

12.   On September 27, 2007, Defendants ACE and WADE commenced construction of the project.

13.     Pursuant to the contract, Defendants ACE and WADE were to complete the project on or before December 30, 2007.

14.     Pursuant to the contract, Defendants ACE and WADE proceeded with the construction of the project and improvements and caused to be erected on the property the outer "shell of a residence" only, which to the present time still has not been completed in accordance with the contract. Moreover, the construction itself is substandard, unreasonably dangerous, and unfit for habitation.

15.     No notice of completion for the building has been filed.

16.     As of January 31, 2008, Defendant FAIRWINDS disbursed $105,641.91 to defendants ACE and WADE.

17.     Plaintiff has performed all conditions of the building contract to be performed by Plaintiff.

## COUNT I
## FRAUDULENT MISREPRESENTATION BY ACE AND WADE

18.     Plaintiff realleges paragraphs 1-17.

19.     On or before July 4, 2007, WADE, individually, and on behalf of Defendant ACE, orally represented to Plaintiff that Defendant WADE was licensed under the laws of Florida to engage in the practice of residential home construction as a General Contractor. Alternatively, WADE, individually, and on behalf of Defendant ACE, orally represented to Plaintiff that Defendant ACE was working under the general contractor's license of Defendant DICKENS, CGC#1508444, who was shown on Defendant ACE's website to be a partner or owner of ACE and who was licensed under the laws of Florida to engage in the practice of residential home construction as a General Contractor.   Moreover, all of WADE's

3

correspondence on behalf of ACE to Plaintiff included Defendant DICKENS' general contractor's license, CGC#1508444.

20.    Defendant WADE made the representation as to having a General Contractor license intending the Plaintiff to rely upon this representation by entering into a contract for Defendants ACE and WADE'S services. Alternatively, WADE made the representation that ACE was working pursuant to DICKENS' General Contractor license intending the Plaintiff to rely upon this representation by entering into a contract for Defendants ACE and WADE'S services.

21.    Beginning with the early stages of construction, Plaintiff discovered that Defendants ACE and WADE had failed to construct the house according to the approved architectural specifications and plans that were made part of the contract. Each time Plaintiff discussed a question or concern about some nonconforming issue with Defendants ACE and WADE, the Defendant WADE belittled Plaintiff for not understanding "how construction works on the site" and assured Plaintiff by representing to her that the final construction of the home would pull together all of the nonconforming issues and somehow result in a house that was "better" than the one provided by the approved architectural specifications and plans.

22.    In reliance upon the above mentioned representations, Plaintiff entered into a contract on July 27, 2007, at 1004 Oak Lane, Apopka, Orange County, Florida, for Defendants ACE and WADE'S services for the demolition, renovation and addition to Plaintiff's residence.

23.    On April 1, 2008, Plaintiff discovered that the representation as to Defendant's license was false in that Defendant WADE was at no time relevant to this action licensed under the laws of Florida to be a licensed General Contractor.

24.    Moreover, on April 1, 2008 Plaintiff discovered that DICKENS was not a partner

4

or owner of ACE at the time of her contract with ACE and that DICKENS had previously withdrawn his license from ACE on September 30, 2007, long before WADE made this false misrepresentation to Plaintiff.

25.  Eventually, a few weeks before Defendants ACE and WADE abandoned the project, Plaintiff began to research the various nonconforming issues and discovered that Defendants ACE and WADE could not cause these nonconforming issues to somehow synergistically conform to the plans as a whole, as Defendants ACE and WADE had previously led Plaintiff to believe.

26.  WADE knew, or should have known, of the falsity of the representation as to having a General Contractor's license when he made the false representation to Plaintiff.

27.  Alternatively, WADE knew, or should have known, of the falsity of the representation as to DICKENS' license when he made the false representation to Plaintiff.

28.  WADE knew, or should have known, of the falsity of the representation that the various nonconforming issues would later be "cured" or that somehow the various nonconforming issues would magically conform with the approved architectural specifications and plans provided in the contract.

29.  Each of the above mentioned representations was a false representation of material fact to the contract.

30.  Plaintiff would not have entered into the contract with Defendants ACE and WADE if Plaintiff had known that Defendant WADE was not licensed or was not operating under the license of a General Contractor.  Moreover, Plaintiff would not have allowed Defendants ACE and WADE to continue with the project had she learned earlier of the multiple misrepresentations of material fact concerning the various nonconforming issues she discussed

5

with Defendant WADE.

31.     As a direct and proximate result of Defendant WADE's misrepresentation Plaintiff has been damaged in that the residential structure constructed on Plaintiff's real property: (1) was not constructed in conformity with the architectural plans drafted by Plaintiff's architect, (2) did not comply with the specifications set out in the contract, (3) was not performed according to accepted standards of care of similar licensed contractors doing business in Orange County, Florida, and (4) will require a complete demolition and rebuild to make safe the normal use of the residence at a cost exceeding the original cost of the contract.

Wherefore, Plaintiff demands judgment against Defendants ACE and WADE for damages, costs of this suit, interest, and such other and further relief as the court deems just and proper.

## COUNT II
## BREACH OF CONTRACT BY ACE AND WADE

32.     Plaintiff realleges paragraphs 1-17.

33.     On July 27, 2007, Plaintiff entered into a written contract with Defendants ACE and WADE for the construction by Defendants ACE and WADE of a residential house, for use by Plaintiff and her family, to be built on Plaintiff's real property.  A copy of the contract, containing the plans and specifications for the house, is attached and marked Exhibit "A."

34.     Defendants ACE and WADE breached the contract in that on or about February 1, 2008, Defendants ACE and WADE stopped work on the Plaintiff's residence, left the construction site and has not since resumed construction on the Plaintiff's residence. Defendants ACE and WADE'S abandonment of construction, described above, was without reasonable justification or excuse.

35.     On February 13, 2008, Defendants ACE and WADE sent Plaintiff a "Letter of Termination," which completely fabricated facts to apparently justify Defendants ACE and WADE breach of contract and shoddy and dangerous workmanship.

36.     Moreover, the construction of the building has not been completed in accordance with the contract between the parties in the following particulars (See: Certified Building Inspector's Report attached as Exhibit "D":

a.  Roof line above the front section of the original house is nonconforming to approved plans;

b.  Nonconforming construction above the living room bay window and on front porch causing leakage along top of bay window;

c.  Nonconforming beam between dining room and family rooms, i.e., plans indicate a concrete/rebar composite beam of 4 feet height between dining room and family room - however, as built, the beam is only 3 feet 3 inches high;

d.  Broken cement block debris visible in the beam between dining and family rooms;

e.  Voids up to 3 ½ inches deep with rebar steel exposed and visible on sides of beam between dining room and family room;

f.  Voids, debris, and exposed rebar is typical with the concrete beam between dining and family rooms;

g.  Condition of concrete surface at beam sides between dining and family rooms indicate the forms came apart during placement of concrete, i.e., sides are not flush, plumb or straight;

h.  Voids and debris present where dining room under laps the concrete lintel adjacent to same between dining and family rooms;

7

i.  Wall height in two story section of house is 21 feet 2 inches instead of 19 feet 4 inches as indicated on approved plans;

j.  First level wall height in two story section is 10 feet 2 inches instead of 9 feet as indicated on approved plans;

k.  Second level wall height is 9 feet 8 inches instead of 9 feet as indicated on approved plans;

l.  Overall building height is 27 feet 4 inches instead of 26 feet as indicated by the approved plans;

m.  Nonconforming spiral stairwell framing, i.e., it is 16 inches too short because the building is actually 16 inches taller than shown in approved plans;

n.  Framing in spiral stair well does not conform to approved plans, i.e., unapproved 2 inch x 4 inch trusses have been installed instead of the triple 2 inch x 10 inch girders required by the approved plans;

o.  Window opening sizes and placements on rear elevation do not conform to the approved plans, i.e., window opening in rear second level wall of kitchen is 10 feet 3 inches wide instead of 10 feet 8 inches as called for by approved plans;

p.  Nearly all window opening sizes and placements vary significantly from approved plans, i.e., 2 feet 6 inches between loft window and upper kitchen window instead of 3 feet 4 inches called for in the approved plans;

q.  Loft window is 6 feet 3 inches wide instead of the 5 feet 4 inches called for in the approved plans;

r.  Window openings and roof line in left elevation of front section do not conform to approved plans, i.e., left elevation plan indicates two windows in left end of original

8

house instead of the three currently present;

s. Rough opening for oval window in spiral stairwell is missing at front elevation;

t. 3 feet 3 inches wall space between kitchen window and family room exterior doors instead of 4 feet called for by the original plans, causing misalignment of windows in rear elevation;

u. Foundation, floor, beam and posts or wall are missing under trusses at left end of front porch;

v. Front porch does not conform to approved plans i.e., there are no construction details or permits for this work;

w. Nonconforming exterior wall heights for both levels of the addition to rear elevation;

x. Nonconforming half wall termination at loft window, i.e., 42 inches half wall in loft terminates into window opening due to nonconforming first level wall height;

y. Nonconforming scissor truss style upstairs from those shown on approved plans, resulting in inability to install air conditioner air handler and ducts in closet at right front corner upstairs due to lack of clearance;

z. Nonconforming second level roof trusses resulted in insufficient clearance to install air handler closet upstairs in right front corner of office area as indicated on approved plans;

aa. Nonconforming interior volume created by errant wall heights and affect of same on air conditioner load calculations and requirements, which requires larger tonnage air conditioner system, i.e., increased interior volume in original section of house due to nonconforming roof alterations;

bb. Elevations in front end of left elevation do not match those in back end of left

9

elevation as required in approved plans;

cc. Condition of framing as relates to effect of prolonged exposure to elements and to rain, i.e., 15# dry in felt is leaking and has been on the roof too long, exposed to bad weather resulting in mold/mildew like material on framing of left rear corner of master suite, in attic above laundry and office areas, and under the felt on the plywood;

dd. Torn, peeling, leaking dry in felt through out house;

ee. Some single wrap tie beam straps at truss ends are off layout by 1.5 inches, requiring solid blocking between truss and offset trusses;

ff. Some trusses have no strap as tie beam pour failed, allowing concrete and strap to sink into block cell, i.e., truss above front second level wall at about midpoint along catwalk between loft and office;

gg. Gable walls upstairs do not conform to approved plans, i.e., there are no hurricane anchors, straps or other devices in place to hold down the gable walls;

hh. Second level gable wall construction does not conform to approved plans, i.e., there are no anchors present for second level gable walls;

ii. None of the SIMPSON hangers/buckets, etc. are in place as called for by the approved plans; and

jj. Missing hurricane anchors, straps, and bolts at multiple locations.

37.    Plaintiff has made demand on Defendants ACE and WADE to complete the work but Defendants ACE and WADE failed, refused, and neglected to do so; Plaintiff has thereby suffered damages exceeding $193,112.00, the amount Plaintiff must pay for the demolition of the existing uninhabitable work and the completion of the unfinished work; all of the foregoing

10

items and the total sum thereof are reasonable.

38.     The delay in completion of the buildings was caused solely by the carelessness, neglect, and failure of the Defendants ACE and WADE to complete the building in accordance with the terms of the written contract; by reason of Defendants ACE and WADE'S failure and neglect, and by reason of his breach of the contract, Plaintiff has suffered damage.

39.     By reason of the failure and neglect of Defendants ACE and WADE to complete the building contract within the agreed time and by reason of breach of the contract and by further reason of the damage suffered by Plaintiff of the amount in excess of $193,112.00, such amounts are due and owing the Plaintiff by Defendants ACE and WADE, no part of which has been paid.

40.     Plaintiff has faithfully and fully performed all of the conditions and covenants required of him to be performed.

41.     As a direct result of Defendants ACE and WADE'S breach of contract, Plaintiff has been damaged in that the residential structure constructed on Plaintiff's real property: (1) was not constructed in conformity with the architectural plans drafted by Plaintiff's architect, (2) did not comply with the specifications set out in the contract, (3) was not performed according to accepted standards of care of similar licensed contractors doing business in Orange County, Florida, and (4) will require a complete demolition and rebuild to make safe the normal use of the residence at a cost exceeding the original cost of the contract.

WHEREFORE, Plaintiff prays for judgment against Defendants ACE and WADE and each of them, as follows:

a.   For compensatory damages;

b.   For prejudgment interest to date of judgment;

11

c.   For reasonable attorney fees according to proof;

d.   For costs of suit herein incurred; and

e.   For such other and further relief as the court may deem proper.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF FITNESS BY ACE AND WADE

42.   Plaintiff realleges paragraphs 1-17.

43.   On July 27, 2007, Plaintiff entered into a written contract with Defendants ACE and WADE for the construction by Defendants ACE and WADE of a residential house, for use by Plaintiff and her family, to be built on Plaintiff's real property.  A copy of the contract, containing the plans and specifications for the house, is attached and marked Exhibit "A."

44.   An implied term of the contract was that Defendants ACE and WADE would construct the residential house in a manner that meets ordinary standards reasonably to be expected of living quarters of comparable kind and quantity. Plaintiff relied on Defendants ACE and WADE to construct a residential house that met those standards of fitness.

45.   Through the early stages of construction, Plaintiff discovered that Defendants ACE and WADE had failed to construct the house according to the approved architectural specifications and plans that were made part of the contract.  Each time Plaintiff discussed a question or concern about some nonconforming issue with Defendants ACE and WADE, the Defendant WADE belittled Plaintiff for not understanding "how construction works on the site" and assured Plaintiff that the final construction of the home would pull together all of the nonconforming issues and somehow result in a house that was better than the one provided by the approved architectural specifications and plans.

12

46.    On or about February 1, 2008, Defendants ACE and WADE stopped work on the Plaintiff's residence, left the construction site and has not since resumed construction on the Plaintiff's residence. Defendants ACE and WADE'S abandonment of construction, described above, was without reasonable justification or excuse.

47.    Subsequently, Plaintiff discovered that Defendants ACE and WADE had failed to construct the house in a reasonable manner more fully described in paragraph 33 (a)-(jj) above.

48.    On April 1, 2008, Plaintiff sent Defendants ACE and WADE a written demand that Defendants ACE and WADE repair the deficiencies in construction of the house. A copy of the demand letter sent to Defendants ACE and WADE is attached to this complaint and marked Exhibit "E." However, Defendants ACE and WADE refused to make the repairs.

49.    As a result of Defendants ACE and WADE'S failure to honor Plaintiff's request, Plaintiff must employ contractors to repair the damage at an estimated cost in excess of $193,112.00.

50.    Plaintiff has suffered additional damages for diminution of the value of the house because it is constructed in an improper manner.

51.    Plaintiff is reasonably certain to suffer additional damages for the repair of defects caused because of Defendants ACE and WADE'S breach of the implied warranty of fitness in failing to properly construct Plaintiff's house. The repairs are necessary to make the house a safe and suitable place for housing Plaintiff and Plaintiff's family.

52.    Defendants ACE and WADE should have foreseen that all of the items of damage would occur due to Defendants ACE and WADE'S failure to construct the residential house in a manner that meets ordinary standards reasonably to be expected of living quarters of comparable kind and quantity.

Wherefore, Plaintiff requests judgment against Defendants ACE and WADE for damages, together with costs of suit, and any other and further relief as the court may deem proper.

## COUNT IV
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING BY ACE AND WADE

53. Plaintiff realleges paragraphs 1-17.

54. Defendants ACE and WADE owed plaintiff, a single, working mother with two children, an implied covenant of good faith and fair dealing under the contract.

55. Defendants ACE and WADE breached their implied covenant of good faith and fair dealing by the following actions:

   a. Defendants misrepresented the status of their general contractors' license;

   b. Defendants misrepresented their experience in building residential homes;

   c. Defendants repeatedly belittled plaintiff's knowledge and understanding of construction every time plaintiff questioned defendants about what appeared to be sloppy, slipshod, or otherwise substandard building conduct;

   d. Defendants repeatedly advised plaintiff that they would complete the job on time, that "everything would come together," and that the home would look even better than she had planned;

   e. Instead of admitting to plaintiff that defendants had incorrectly measured and/or incorrectly constructed trusses, walls, windows, doors, roofing elevations, pitch, and angles, support beams, stairwell, porch, and other deficiencies listed in paragraph 35 above, defendants repeatedly tried to cover up their shoddy work and constantly revised the plans for the home until it became nothing like the plans originally

14

designed and agreed to between the parties.

Wherefore, Plaintiff requests judgment against Defendants ACE and WADE for damages, together with costs of suit, and any other and further relief as the court may deem proper.

## COUNT V
## UNJUST ENRICHMENT BY ACE AND WADE

56. Plaintiff realleges paragraphs 1-17.

57. Plaintiff's home lies in shambles and is unsafe and otherwise uninhabitable.

58. Defendants ACE and WADE have absconded with over $100,000 of the construction loan money.

59. Defendants have not fulfilled their obligation to construct the home according to plans and in a save, workmanlike fashion.

60. Defendants have been unjustly enriched at plaintiff's expense.

Wherefore, Plaintiff requests judgment against Defendants ACE and WADE for damages, together with costs of suit, and any other and further relief as the court may deem proper.

## COUNT VI
## CIVIL THEFT BY ACE AND WADE

61. Plaintiff realleges paragraphs 1-17.

62. Sometime after entering into the written Agreement and separate and distinct from any issue of performance under said Agreement, the Defendants ACE and WADE, WADE and ACE, conspired and acted in concert to create a scheme to intentionally steal money from the Plaintiff by misrepresenting to the Plaintiff's Lender that Defendants ACE and WADE had performed

15

certain conditions precedent to payment draws when, in fact, Defendants ACE and WADE knew that the conditions precedent had not been met.

63. This conduct of Defendants ACE and WADE was clothed with felonious intent to steal from Plaintiff.

64. There was obvious inequality of economic resources between Plaintiff and Defendants ACE and WADE, in that Plaintiff had given Defendants ACE and WADE her life savings to improve her residence, which Defendants ACE and WADE abandoned, and she had no financial ability to hire another General Contractor to fix and finish the substandard and dangerous project left behind by Defendants ACE and WADE.

65. Specifically, at and prior to the time Defendants ACE and WADE requested draws from Plaintiff's Lender, the Defendants ACE and WADE knew that the work on Plaintiff's residence either had not been done or it had not been done as provided by the plans and specifications of Plaintiff's architect.

66. Defendants ACE and WADE made the following statements, which the Defendants ACE and WADE knew to be false at the time the statements were made, with the intent to induce Plaintiff's Lender to rely on said statements:

    a.  That Defendants ACE and WADE held a proper and valid contractors' license to build Plaintiff's residence;

    b.  That Defendants ACE and WADE had completed similar construction projects prior to agreeing to build Plaintiff's residence;

    c.  That Defendants ACE and WADE had substantially completed all construction in a reasonable fashion necessary to obtain draws from Plaintiff's lender; and

16

d.  That Defendants ACE and WADE had paid all subcontractors for the work the subcontractors had performed.

67. Section 772.11, Florida Statutes, provides a civil remedy for theft or exploitation such as occurred here, namely any person injured in any fashion as a result of the violation of Sections 812.012-812.037, Florida Statutes, has a cause of action for threefold the actual damages sustained, along with attorney's fees and court costs.

68. As defined in Section 812.012, Florida Statutes, theft includes obtaining property by fraud, willful misrepresentation of a future act, or false promise.  Property means anything of value and includes tangible or intangible personal property.  Tangible personal property includes money, for example, the $105,641.91, the Defendants ACE and WADE wrongly misappropriated from Plaintiff's Lender.

69. The conduct of Defendants ACE and WADE, individually, and collectively, in obtaining the property of Plaintiffs by fraud, willful misrepresentation, and false promise constituted a theft separate and distinct from any loss flowing from any alleged breach of contract.

70. The conduct of Defendants ACE and WADE was purposeful, intentional, and designed to permanently deprive the Plaintiff of her life savings or more, and, in fact, Defendants ACE and WADE succeeded in doing so.

71. The Defendants ACE and WADE fraudulently induced Plaintiff's Lender to release funds to the Defendants ACE and WADE for work the Defendants ACE and WADE knew that they had not performed or for work that had been performed but was not in compliance with the plans and specifications of Plaintiff's architect

72. As a further direct and proximate result of the conduct of Defendants ACE and WADE, Plaintiffs have retained undersigned counsel and have become obligated to pay said counsel a

17

reasonable attorney's fee for services rendered. Section 772.11, F.S., provides for the recovery of attorney's fees for Civil Theft.

73. All conditions precedent to this action have been complied with, or waived.

WHEREFORE, Plaintiffs demand such relief as this Court deems appropriate including, but not limited to, judgment for treble damages against Defendants ACE and WADE as well as interest, costs, attorney's fees, and such other relief as may be just and proper under the circumstances.

## COUNT VII
## VIOLATION OF FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT BY ACE AND WADE

74. Plaintiff realleges paragraphs 1-17.

75. Plaintiff is a "consumer" as defined by §501.203(7) Fla. Stat. (2006).

76. Defendant ACE is a business entity engaged in "trade or commerce" as defined by §501.203(8) Fla. Stat. (2006).

77. Defendant WADE, acting on behalf of Defendant ACE, committed deceptive and unfair trade practices. Specifically WADE and ACE committed the following deceptive, unconscionable, or unlawful acts:

    a. Intentionally misrepresented to the plaintiff that WADE had a current and valid general contractor's license;

    b. Intentionally misrepresented to the plaintiff that ACE had a current and valid general contractor's license;

    c. Intentionally misrepresented to the plaintiff that ACE and/or WADE was working under a current and valid general contractor's license;

    d. Intentionally misrepresented to the plaintiff that ACE and/or WADE had authority

18

to work under Marlo DICKENS' general contractor's license, CGC#1508444;

e.   Intentionally misrepresented to the plaintiff that WADE had considerable experience in remodeling residential homes;

f.   Intentionally misrepresented to the plaintiff that ACE had considerable experience in remodeling residential homes;

g.   Intentionally misrepresented to the plaintiff that her home was being built according to specifications;

h.   Intentionally misrepresented to the plaintiff that her home was being built in a safe and workmanlike manner;

i.   Intentionally misrepresented to the plaintiff that any defects existing in plaintiff's home was the result of faulty or inaccurate building plans by plaintiff's architect;

j.   Intentionally misrepresented to the plaintiff that any delays in construction was due to faulty or inaccurate building plans by plaintiff's architect;

k.   Intentionally misrepresented to the plaintiff that any delays in construction was due to plaintiff's interference on the job site; and

l.   Intentionally misrepresented to the plaintiff that each stage of construction was completed in a workmanlike manner so that ACE and/or WADE could fraudulently obtain draws from the lender.

78. In reliance upon the above mentioned representations, Plaintiff entered into a contract on July 27, 2007, at 1004 Oak Lane, Apopka, Orange County, Florida, for Defendants ACE and WADE'S services for the demolition, renovation and addition to Plaintiff's residence.

79. Defendants WADE and ACE's deceptive, unconscionable, and unlawful acts violate §501.204(1) Fla. Stat. (2006) and provide a basis for civil penalty pursuant to §501.203(7) Fla.

19

Stat. (2006).

80. Plaintiff has been damaged as a direct and proximate result of WADE and ACE's deceptive, unconscionable, and unlawful acts.

81. Plaintiff is entitled to recover actual damages, attorneys fees and court costs pursuant to §501.211 Fla. Stat. (2006).

WHEREFORE, Plaintiffs demand such relief as this Court deems appropriate including, but not limited to, judgment for damages against Defendants ACE and WADE as well as interest, costs, attorney's fees, and such other relief as may be just and proper under the circumstances.

## COUNT VIII
## DICKENS' NEGLIGENCE

82. Plaintiff realleges paragraphs 1-17.

83. Defendant DICKENS owed a duty to the general public, including the Plaintiff, for all work performed using his general contractor's license, CGC#1508444.

84. DICKENS' duty is non-delegable and DICKENS is directly liable for the negligent acts of any persons or entity under DICKENS' control, direct or indirect, including employees, agents, consultants, or independent contractors. Moreover, DICKENS is liable for the negligent acts of any persons or entity using DICKENS' general contractor's license, CGC#1508444.

85. DICKENS breached his duty to Plaintiff by failing to use reasonable care in supervising ACE and/or WADE in the construction of Plaintiff's home.

86. As a direct and proximate result of DICKENS' breach of the standard of care, Plaintiff has suffered damages.

Wherefore, Plaintiff requests judgment against Defendant DICKENS for damages, together with costs of suit, and any other and further relief as the court may deem proper.

## COUNT IX
### DICKENS' VICAROUS LIABILITY

87. Plaintiff realleges paragraphs 1-17.

88. Defendant DICKENS owed a duty to the general public, including the Plaintiff, for all work performed using his general contractor's license, CGC#1508444.

89. DICKENS allowed Defendants WADE and/or ACE to represent to the general public that he was a partner of WADE and/or ACE by allowing WADE and/or ACE to use his general contractor's license, CGC#1508444, and by allowing WADE and/or ACE to advertise on ACE's website that DICKENS was a partner of WADE and/or ACE, thus creating either an actual or apparent agency relationship.

90. Defendants WADE and/or ACE acted with apparent authority of DICKENS by using DICKENS' general contractor's license, CGC#1508444, to obtain permits for construction and by using DICKENS' general contractor's license, CGC#1508444 on all correspondence with plaintiff.

91. Plaintiff relied upon these representations in contracting with Defendants WADE and/or ACE for the remodeling of her home and acted upon these representations by paying Defendants WADE and/or ACE for the shoddy work they performed.

92. Plaintiff sustained damages as a proximate result of the negligent and faulty construction of Defendants WADE and/or ACE.

93. Defendant DICKENS is vicariously liable for the damages caused by the negligent acts of WADE and/or ACE, who acted as apparent agents for DICKENS.

21

Wherefore, Plaintiff requests judgment against Defendant DICKENS for damages, together with costs of suit, and any other and further relief as the court may deem proper.

## COUNT X
## NEGLIGENT DISBURSEMENT OF CONSTRUCTION FUNDS
## BY FAIRWINDS

94. Plaintiff realleges paragraphs 1-17.

95. Defendant FAIRWINDS owed a duty to plaintiff, a single, working mother with two children, to disburse the construction funds in a reasonable manner in compliance with federal, state and local regulations.

96. Defendant FAIRWINDS breached its duty by disbursing funds to defendants WADE and ACE and/or their subcontractors without regard to the quality or the timeliness of the work performed.

97. As a proximate result of FAIRWINDS's negligent disbursement of construction funds, plaintiff has been damaged.

Wherefore, Plaintiff requests judgment against Defendant FAIRWINDS for damages, together with costs of suit, and any other and further relief as the court may deem proper.

## COUNT XI
## BREACH OF FIDUCIARY DUTY BY FAIRWINDS

98. Plaintiff realleges paragraphs 1-17.

99. Defendant FAIRWINDS promised plaintiff, a single, working mother with two children, that it would protect her and make sure that no one took advantage of her during the construction phase of her home.

100. Defendant FAIRWINDS owed plaintiff, a single, working mother with two children, a fiduciary duty to ensure that her best interests were protected in the disbursement of

construction funds.

101.    Defendant FAIRWINDS breached its duty to plaintiff by, among other things:

    a.  Negligently failing to ensure that Defendants WADE and/or ACE were properly licensed contractors;

    b.  Negligently failing to require Defendants WADE and/or ACE to obtain adequate extended insurance coverage to protect against Windstorm risk;

    c.  Negligently failing to require Defendants WADE and/or ACE to obtain adequate builders risk insurance coverage to protect against damage to the property and delay in completion;

    d.  Negligently failing to require Defendants WADE and/or ACE to obtain adequate completed operations coverage to protect against negligent work of subcontractors;

    e.  Negligently failing to require Defendants WADE and/or ACE to obtain commercial general liability insurance with plaintiff as an additional named insured;

    f.  Negligently failing to require Defendants WADE and/or ACE to obtain a performance bond to protect against defective and incomplete performance; and

    g.  Negligently failing to monitor disbursements to contractors and subcontractors;

102.    As a proximate result of FAIRWINDS's breach of this fiduciary duty, plaintiff has been damaged.

Wherefore, Plaintiff requests judgment against Defendant FAIRWINDS for damages, together with costs of suit, and any other and further relief as the court may deem proper.

### COUNT XII
### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### BY FAIRWINDS

103.    Plaintiff realleges paragraphs 1-17.

104.    Defendant FAIRWINDS owed plaintiff, a single, working mother with two children, an implied covenant of good faith and fair dealing under the contract, to ensure that her best interests were protected in the construction of her home.

105.    Defendant FAIRWINDS breached its duty to plaintiff by, among other things:

   a.  Negligently failing to ensure that Defendants WADE and/or ACE were properly licensed contractors;

   b.  Negligently failing to require Defendants WADE and/or ACE to obtain adequate extended insurance coverage to protect against Windstorm risk;

   c.  Negligently failing to require Defendants WADE and/or ACE to obtain adequate builders risk insurance coverage to protect against damage to the property and delay in completion;

   d.  Negligently failing to require Defendants WADE and/or ACE to obtain adequate completed operations coverage to protect against negligent work of subcontractors;

   e.  Negligently failing to require Defendants WADE and/or ACE to obtain commercial general liability insurance with plaintiff as an additional named insured;

   f.  Negligently failing to require Defendants WADE and/or ACE to obtain a performance bond to protect against defective and incomplete performance;

   g.  Negligently disbursing funds to defendants WADE and ACE and/or their subcontractors without regard to the quality or the timeliness of the work performed; and

24

h.  Otherwise negligently failing to monitor disbursements to contractors and subcontractors;

106.    As a proximate result of FAIRWINDS's breach of this fiduciary duty, plaintiff has been damaged.

Wherefore, Plaintiff requests judgment against Defendant FAIRWINDS for damages, together with costs of suit, and any other and further relief as the court may deem proper.

Respectfully submitted,

JOHN M. BRENGARDNER, ESQ.
Florida Bar No. 345512

ALLEN & MURPHY, P.A.
429 S. Keller Road
Orlando, Florida 32810
Tel:  407.838.2000
Facsimile: 407.838.2022
Attorneys for Plaintiff

25



# ACE

2715 West Fairbanks Avenue
Suite 201
Winter Park, Florida 32789
407-648-4915 / Fax 407-472-1225
Website: www.acecm.biz

### Contract To Build

**OWNER'S NAME: BETTY LLANIO**
**ADDRESS: 1004 Oak Lane**
**PROJECT ADDRESS: 1004 Oak Lane, Apopka, Florida 32703**

### PARTIES

This contract (hereinafter referred to as "Agreement") is made and entered into on this __27__ day of _July , 2007_ , by and between **Betty LLanio** , **(hereinafter referred to as "Owner")**; and **Associated Cost Engineers, Inc. of Delaware (ACE)** (hereinafter referred to as "Contractor"), in consideration of the mutual promises contained herein, Contractor agrees to perform the following work:

### SCOPE OF SERVICES

The complete addition, minor demolition and renovation of the proposed single family residence of approximately 2400 sq.ft.per provided plans and specifications. Plans Specifications and site plans to be provided and accepted upon review of Contractor and Owner. **SEE ATTACHMENT A**

We propose to provide the above services complete in accordance with accepted standards and specifications for the lump sum price:

> **LUMP SUM PRICE FOR ALL WORK ABOVE:  $ $193,112**
>
> **THIS PRICE COULD CHANGE AFTER REVIEW OF FINAL DRAWINGS.**
> PRICE GOOD FOR DURATION OF PROJECT

### EXCLUSIONS

This Agreement does *not* include *labor or materials* for the following work:

1. **PROJECT SPECIFIC EXCLUSIONS:** None

2. **STANDARD EXCLUSIONS:** Unless specifically included in the "General Scope of Work" section above, this Agreement does *not* include *labor or materials* for the following work (any Exclusions in this paragraph which have been lined out and initialed by the parties do not apply to this Agreement): Surveying that may be required to establish accurate property boundaries for setback purposes (fences and old stakes may not be located on actual property lines)

Construction Managers + General Contractors
LIC# CGC 1508444                                                                  1

JUL 27,2007 11:16A  ỹ

*Page 2*


EXHIBIT
"A"

GENERAL CONDITIONS FOR THE AGREEMENT ABOVE

## ASSOCIATED COST ENGINEERS, INC. OF DELAWARE
### GENERAL CONDITIONS

## SECTION 1 : RESPONSIBILITIES

1.1    ACE., heretofore referred to as the "Contractor," has the responsibility for providing the services described under the "Scope of Services" section. The work is to be performed according to accepted standards of care of similar licensed contractors doing business in Orange County, Florida and is to be completed in a timely manner.

1.2    The Client shall supply the Contractor with all maps, site plans, reports, surveys and designs, reasonably available to Client to allow the Contractor to properly complete the specified services. The Client shall also communicate changes in the nature and scope of the project as soon as possible during performance of the work so that the changes can be incorporated into the work product.

## SECTION 2: STANDARD OF CARE

2.1    Services performed by the Contractor under this Agreement are expected by the Client to be conducted in a manner consistent with the level of care and skill ordinarily exercised by members of the Contractor's profession practicing contemporaneously under similar conditions in the locality of the project. No other warranty, expressed or implied, is made, except as may be provided by manufacturers of materials incorporated into the project.

2.2    The Client recognizes that subsurface conditions may vary from those observed at locations where borings, surveys, or other explorations are made, and that site conditions may change with time. Data, interpretations, and recommendations by the Contractor will be based solely on information available to the Contractor at the time of service. The Contractor is responsible for those data, interpretations, and recommendations, but will not be responsible for other parties' interpretations or use of the information developed.

## SECTION 3: SITE ACCESS AND SITE CONDITIONS

3.1    Client will grant or obtain free access to the site for all equipment and personnel necessary for the Contractor to perform the work set forth in this Agreement. The Client will notify any and all possessors of the project site that Client has granted Contractor free access to the site. The Contractor will take reasonable precautions to minimize damage to the site, but it is understood by Client that, in the normal course of work, some damage may occur, and the correction of such damage is not part of this Agreement unless so specified in the Proposal. Contractor will notify Client of any anticipated damage to the site prior to commencing any portion of the project that may cause damage, and Client will determine in her sole discretion whether to authorize such work.

Construction Managers + General Contractors
LIC# CGC 1508444                                         2

The Client has informed the Contractor to the best of her knowledge the accuracy of locations for all subterranean structures and utilities. The Contractor will take reasonable precautions to avoid known subterranean structures.

3.3  Owner shall be given 24 – 48 hours in advance notice of deliveries, scheduled trades, inspections Etc.. that will be working on site.

## SECTION 4: SAMPLE OWNERSHIP AND DISPOSAL

4.1  Soil or water samples obtained from the project during performance of the work shall remain the property of the Client.

4.2  The Contractor will dispose of or return to Client all remaining soils and rock samples 60 days after submission of report covering those samples. Further storage or transfer of samples can be made at Client's expense upon Client's prior written request.

4.3  Samples which are contaminated by petroleum products or other chemical waste will be returned to Client for treatment or disposal, consistent with all appropriate federal, state, or local regulations.

## SECTION 5: BILLING AND PAYMENT

5.1  In absence of an approved bank or lender draw schedule refer to Attachment B and 5.2 and 5.3 shall apply.  Contractor will submit invoices to Client upon receipt from sub-contractors or suppliers with a minimum of bi-weekly or upon completion of specified project phases. Invoices will show charges for different personnel and expense classifications.

5.2  Payment shall be made in accordance with the draw schedule of Client's lender.

5.3  If the Contractor incurs any expenses to collect overdue billings on invoices, the sums paid by the Contractor for reasonable attorney's fees, court costs, and interest will be due and owing by the Client

Construction Managers + General Contractors
LIC# CGC 1508444                                         3

## SECTION 6: OWNERSHIP OF DOCUMENTS

6.1   All reports, boring logs, field data, field notes, laboratory test data, calculations, estimates, and other documents prepared by the Contractor, as instruments of service, shall remain the property of the Contractor. Copies shall be provided to owner.

6.2   Client agrees that all reports and other work furnished to the Client or his agents, which is not paid for, will be returned upon demand and will not be used by the Client for any purpose.

6.3   The Contractor will retain all pertinent records relating to the services performed for a period of five years following submission of the report, during which period the records will be made available to the Client at all reasonable times.

## SECTION 7: DISCOVERY OF UNANTICIPATED HAZARDOUS MATERIALS

7.1   Client represents that a reasonable effort has been made to inform Contractor of known or suspected hazardous materials on or near the project site.

7.2   Under this agreement, the term hazardous materials includes hazardous materials (40 CFR 172.01), hazardous wastes (40 CFR 261.2), hazardous substances (40 CFR 300.6), petroleum products, polychlorinated biphenyls, and asbestos.

7.3   Hazardous materials may exist at a site where there is no reason to believe they could or should be present. Contractor and Client agree that the discovery of unanticipated hazardous materials constitutes a changed condition mandating a renegotiation of the scope of work. Contractor and Client also agree that the discovery of unanticipated hazardous materials may make it necessary for Contractor to take immediate measures to protect health and safety.

7.4   Contractor agrees to notify Client when unanticipated hazardous materials or suspected hazardous materials are encountered. Client agrees to make any disclosures required by law to the appropriate governing agencies. Client also agrees to hold Contractor harmless for any and all consequences of disclosures made by Contractor which are required by governing law. In the event the project site is not owned by Client, Client recognizes that it is the Client's responsibility to inform the property owner of the discovery of unanticipated hazardous materials or suspected hazardous materials.

## SECTION 8: RISK ALLOCATION

8.1   Client agrees that Contractor's liability for any damage on account of any error, omission or other professional negligence will be limited to a sum not to exceed $1,000,000 or Contractor's fee, whichever is greater.

Construction Managers + General Contractors
LIC# CGC 1508444                                                    4

## SECTION 9: INSURANCE

9.1   The Contractor represents and warrants that it and its agents, staff and Contractors employed by it, is and are protected by worker's compensation insurance and that Contractor has such coverage under public liability and property damage insurance policies which the Contractor deems to be adequate. Certificates for all such policies of insurance shall be provided to Client upon request in writing. Contractor agrees to indemnify and save Client harmless from and against loss, damage, or liability arising from negligent acts by Contractor, its agents, staff, and Contractors employed by it. The Client agrees to defend indemnify and save Contractor harmless for loss, damage or liability arising from acts by client or client's independent Contractors employed by Client.

## SECTION 10: DISPUTE RESOLUTION

10.1   All claims, disputes, and other matters in controversy between Contractor and Client arising out of or in any way related to this Agreement will be submitted to alternative dispute resolution (ADA) such as mediation and/or arbitration, before and as a condition precedent to other remedies pro.vided by law.

10.2   If a dispute at law arises related to the services provided under this Agreement and that dispute requires litigation instead of ADA as provided above, then.

   (a) the claim will be brought and tried in judicial jurisdiction of the court of the county where Contractor's principal place of business is located and Client waives the right to remove the action to any other county or judicial jurisdiction, and

   (b) the prevailing party will be entitled to recovery of all reasonable costs inrcurred, including court costs, attorney's fees.

## SECTION 11 :TERMINATION

11.1   This agreement may be terminated by either party upon seven (7) days written notice in the event of substantial failure by the other party to perform in accordance with the terms hereof. Such termination shall not be effective if that substantial failure has been remedied before expiration of the period specified in the written notice. In the event of termination, Contractor shall be paid for services performed to the termination notice date, unless Contractor is in default, in which case Client shall be entitled to off-set any damages resulting from Contractor's default against any sums due for services performed by Contractor prior to its default.

## SECTION 12: ASSIGNS

12.1   Neither the Client nor the Contractor may delegate, assign, sublet or transfer his duties or interest in this Agreement without the written consent of the other party .

## SECTION 13: GOVERNING LAW AND SURVIVAL

13.1  The laws of the State of Florida will govern the validity of these Terms, their interpretation and performance.

13.2  If any of the provisions contained in this Agreement are held illegal, invalid, or unenforceable, the enforceability of the remaining provisions will not be impaired. Limitations of liability and indemnities will survive termination of this Agreement for any cause.

## DATE OF WORK COMMENCEMENT AND SUBSTANTIAL COMPLETION

Commence work: <u>After receipt of permit and first draw</u>. Service time through completion: Approximately <u>December 30, 2007</u> *not* including delays and adjustments for delays caused by: holidays, inclement weather, accidents, shortage of labor or materials, additional time required for completion of Change Order work (as specified in each Change Order), delays caused by Owner, acts of God.

## LIQUIDATED DAMAGES

Owner may penalize Contractor $100.00 a day after December 30, 2007 if property is not substantially complete.

## EXPIRATION OF THIS AGREEMENT

This Agreement will expire 30 days after the date at the top of page one of this Agreement if not accepted in writing by Owner and returned to Contractor within that time. You, the OWNERS, may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction.

## CHANGE ORDERS: CONCEALED CONDITIONS, ADDITIONAL WORK, AND CHANGES IN THE WORK

1. **PEOPLE AUTHORIZED TO SIGN CHANGE ORDERS:** The following people are authorized to sign Change Orders:
Betty LLanio
Owners or ___N/A._____
(Please fill in line(s) above at time of signing Agreement)

2. **CONCEALED CONDITIONS:** This Agreement is based solely on the observations Contractor was able to make with the site or structure in its current condition at the time this Agreement was bid. If additional Concealed Conditions are discovered once work has commenced which were *not* reasonably visible to a licensed contractor similar to Contractor at the time this proposal was bid, Contractor will stop work and point out these unforeseen Concealed Conditions to Owner so that Owner and Contractor can execute a Change Order for any Additional Work.

Construction Managers + General Contractors
LIC# CGC 1508444                                            6

**3. CHANGES IN THE WORK:** During the course of the project, Owner may order changes in the work (both additions and deletions). The cost of these changes will be actual cost plus 18% which includes contractor's profit, overhead and supervisory labor.

**4. DEVIATION FROM SCOPE OF WORK IN CONTRACT DOCUMENTS:** Any alteration or deviation from the Scope of Work referred to in the Contract Documents involving extra costs of materials or labor (including any overage on ALLOWANCE work) should be executed upon a written Change Order issued by Contractor and should be signed by Contractor and Owner prior to the commencement of any Additional Work. This Change Order will become an no extra charge over and above the Lump Sum Contract Price referred to at the beginning of this Agreement.

**5. CHANGES REQUIRED BY PLAN CHECKERS OR FIELD INSPECTORS:** Any increase in the Scope of Work set forth in the Contract Documents which is required by plan checkers or field inspectors with city or county building/planning departments will be treated as Additional Work to this Agreement for which the Contractor will issue a Change Order.

**5. RATES CHARGED FOR ALLOWANCE-ONLY AND TIME-AND-MATERIALS WORK:** Contractor will charge for profit and overhead at the rate of 0% on all work performed on a Time-and-Materials basis (on both materials and labor rates set forth in this paragraph) and on all costs that exceed specifically stated ALLOWANCE estimates in the Agreement.

## PAYMENT SCHEDULE AND PAYMENT TERMS

**1. PAYMENT SCHEDULE: Payment to be made as follows.** Client shall provide Contractor with her lender's draw schedule for Contractor's approval which shall be binding on Contractor thereafter.

**2. PAYMENT OF CHANGE ORDERS:** Payment for each Change Order is 0% to start (unless other arrangements made) and the rest due upon completion of Change Order work and submittal of invoice by Contractor.

**3. FINAL CONTRACT PAYMENT:** The final contract payment is due and payable upon final invoice for all work under contract.

**4. CONTROL AND DIRECTION OF EMPLOYEES AND SUBCONTRACTORS:** Contractor, or his appointed Supervisor, shall be the sole supervisor of Contractor's Employees and SubContractors. Owner must not order or request Contractor's Employees or SubContractors to make changes in the work. All changes in the work are to be first discussed with Contractor and then performed according to the Change Order process as set forth in this Agreement.

Construction Managers + General Contractors
LIC# CGC 1508444

7

**5. CONTRACTOR NOT TO BE RELIED UPON AS ARCHITECT, ENGINEER, OR DESIGNER:** The Contractor is *not* an architect, engineer, or designer. Contractor is not being hired to perform any of these services. To the extent that Contractor makes any suggestions in these areas, the Owner acknowledges and agrees that Contractor's suggestions are merely options that the Owner may want to review with the appropriate design professional for consideration. Contractor's suggestions are not a substitute for professional engineering, architectural, or design services, and are not to be relied on as such by Owner.

## LIEN RELEASES

Owner, Contractor and SubContractors will issue appropriate lien releases prior to each draw payment and receiving final payment from Owner.

## ENTIRE AGREEMENT, SEVERABILITY, AND MODIFICATION

This Agreement represents and contains the entire agreement between the parties. Prior discussions or verbal representations by Contractor or Owner that are not contained in this Agreement are *not* a part of this Agreement. In the event that any provision of this Agreement is at any time held by a Court to be invalid or unenforceable, the parties agree that all other provisions of this Agreement will remain in full force and effect. Any future modification of this Agreement must be made in writing and executed by Owner and Contractor in order to be valid and binding upon the parties.

I have read and understood, and I agree to, all the terms and conditions contained in the Agreement above.

7/27/07
Date         CONTRACTOR'S SIGNATURE

7/23/07
Date         OWNER'S SIGNATURE

Date         OWNER'S SIGNATURE

Construction Managers + General Contractors
LIC# CGC 1508444                                              8

## ATTACHMENT A

A meeting requested by the owner on July 14, 2007 was scheduled at 2:00 pm at project site, 1004 Oak Lane, Apopka, Florida 32703. The attendees were Owner, Betty LLanio and JaJa Wade, President of Associated Cost Engineers, Inc. of Delaware (ACE). The following topics were discussed and agreed to be added to contract in the form of an attachment.

Cabinets
    Pictures were shown to ACE of cabinet type and hardware that is included in price. Cabinet sample shall be shown to owner.

Appliances
    Stainless Steel Jenn Air Appliances – Double Oven, Refrigerator, Microwave Oven and Dishwasher
    Jenn Air Range

Kitchen
    Counter Top Color: Black Granite
    Double Sink Color: Black

Bedroom Windows
    Bottom windows shown on rear elevation need to be arched

Exterior Finish
    Owner wants to explore the cost difference between stucco which is shown on plans and brick the Owners desired exterior finish. If brick is decided then a change order needs to be issued per, page 7 of contract.

Master Bathroom
    Roman Tub and Sink – color: Black
    Granite color: Black
    Sink in existing master bathroom shall be relocated to guest bathroom. The color of existing sink is black so the shower tile and toilet need to be black in guest bathroom in the addition.

Spiral Staircase
    Color: Black, the darkest black available
    Finish: Metal
    Style: Deco
    Owner showed contractor website, www.sprialstairsofamerica.com
        Picture 405 is the type of step desired
        Picture 408 & 409 type of staircase desired
        No tile on spiral staircase

Construction Managers + General Contractors
LIC# CGC 1508444

9

JUL 27,2007 11:18A y                                             page 10

Railings
Owner requests that the railings of staircase and spiral staircase need to match in color, type etc...

Staircases
Spiral staircase treads and regular staircase treads shall match.

Dining Room Columns
Owners desired columns were shown on www.spiralstairsofamerica.com picture #316.

Windows
Owner requests that lines to be built inside the glass as it exists on front of house
Owner requests same oval pattern on existing front door match the Oval on enclosure of spiral staircase.

Flooring
Tile throughout the first floor contractor shall match to as near as possible to existing tile however no tile on stairs.

Guest Bathroom
Shower can be a pop in or build shower and install black tile (8x12)

It is futher understood that for terms of occupying existing home by August 20 at least have one bedroom liveable and one bathroom working.

Construction Managers + General Contractors
LIC# CGC 1508444                              10

CONSTRUCTION LOAN INSPECTION RECORD
Property Address: 1364 OAK LANE, APOPKA, FL 32703
Borrower/Builder/Phone
Owner's Name: BETTY LUND

County: Seminole

## ATTACHMENT B

| Project #: | 1966-467 |
| Budget: | 157,511.2020 |
| Builder: | ACE INC. |
| Phone: | 407-886-4415 |
| E-mail: | lund@abc.com.kk |
| Fax #: | 407-473-1725 |

| | % | Contract Draws | 1 | 2 | 3 | 4 | 5 | 6 | (Draw to Date Available to Date) |
|---|---|---|---|---|---|---|---|---|---|
| Contract Mobilization | | | | | | | | | |
| **MOBILIZATION: 30%** | 20% | 175,311.90 | | | | | | | |
| Permits | 5% | 69,905.90 | | | | | | | |
| Fill - Pre-Orient | 5% | 69,905.90 | | | | | | | |
| Sub-Total Mobilization | 30% | 39,952.80 | | | | | | | |
| **SLAB/LINTEL: 25%** | | | | | | | | | |
| Occupation | | | | | | | | | |
| Sub | 5% | 9,905.80 | | | | | | | |
| Rough Plumbing | 10% | 19,221.26 | | | | | | | |
| Fill, Footer/Grade Beam, Compacted and Lintel Poured | 2% | 3,182.26 | | | | | | | |
| Second Floor Beams Walls and Slab in Place | 1% | 1,792.86 | | | | | | | |
| Second Floor Exterior Walls Complete | 2% | 3,682.24 | | | | | | | |
| Sub-Total SLAB/LINTEL | 25% | 3,182.24 | | | | | | | |
| | 25% | 49,191.10 | | | | | | | |
| **Framing: 25%** | | | | | | | | | |
| 4. Interior Partitions | 5% | 6,596.84 | | | | | | | |
| 5. Tresses Set, Roof Decked and Dried In | 5% | 9,939.04 | | | | | | | |
| 6. Rough Heat & In | 3% | 5,190.89 | | | | | | | |
| 7. A/C Duct & In-Place | 3% | 5,190.89 | | | | | | | |
| 8. Plumbing Rough Heat/Tub Set | 2% | 3,782.36 | | | | | | | |
| 9. Windows (excluding Sunglass) Installed | 2% | 3,782.36 | | | | | | | |
| 10. Finish Roof On | 2% | 3,396.36 | | | | | | | |
| Sub-Total FRAMING | 25% | 47,962.22 | | | | | | | |
| **DRYWALL: 10%** | | | | | | | | | |
| 11. Wall Insulation Installed | 2% | 3,682.24 | | | | | | | |
| 12. Drywall Hung | 2% | 3,682.24 | | | | | | | |
| 13. Drywall Finished and Textured | 2% | 3,682.24 | | | | | | | |
| 14. Tub and Shower Wall Tile Complete | 2% | 3,682.24 | | | | | | | |
| 15. Exterior Siding/Stucco/Brick | 2% | 3,682.24 | | | | | | | |
| Sub-Total DRYWALL | 10% | 18,911.20 | | | | | | | |
| **TRIM OUT: 19%** | | | | | | | | | |
| 16. Interior & Exterior Paint Complete Including Base | 3% | 5,709.90 | | | | | | | |
| 17. Door/Interior Trim/Cabinet Complete/Garage Door Installed | 3% | 5,793.90 | | | | | | | |
| 18. Cabinets Installed | 1% | 1,887.21 | | | | | | | |
| 19. Plumbing Trim Complete, Heater Tank Set | 2% | 3,536.34 | | | | | | | |
| 20. Plumbing Fixture and Hardware | 1% | 1,882.34 | | | | | | | |
| 21. Electrical Finish/Lighting Set | 2% | 3,682.24 | | | | | | | |
| Sub-Total TRIM | 10% | 20,526.46 | | | | | | | |
| **FINAL: 5%** | | | | | | | | | |
| 22. Walks/Drives/Approach/Entrances | 2% | 3,682.24 | | | | | | | |
| 23. Floor Covering (Carpet, Tile and Vinyl) | 2% | 3,370.86 | | | | | | | |
| 24. Walls/Driveways | 0% | | | | | | | | |
| 25. Landscape/Sod Complete | 1% | | | | | | | | |
| 26. Final Cleanlike/Extrances | 1% | 2,943.89 | | | | | | | |
| Sub-Total FINAL | 5% | 727.43 | | | | | | | |
| | 5% | 10,960.33 | | | | | | | |
| **TOTAL DRAWN** | 100% | 196,173.84 | | | | | | | |

JUL 27, 2007 11:19A 9

P 14/22

2008-06-21 17:04    407830110S ->    VOICEMAIL

**Miles Roofing Inc. FL LIC #:  C-CC1326064**
5180 Rishley Run Way
Mount Dora, FL 32757
Phone:  386-561-0616
Fax:  352 385 5117

**Proposal and Contract**
Name: Betty Llanio / A.C E
Site Address: 1004 Oak Lane Apopka, FL 32703
Mailing Address:
Phone:

**Proposal and Contract for:**  Furnish and Installation of Metro, Roman Tile roof system

❖  **Scope of work includes:**
  • Dry in roof with self adhering Polystick TU underlayment
  • Install Metro brand Roman Tile metal stone coated roof shingles
  • Including 26 ga. 2.5" painted eave drip
  • Including new plumbing kitchen and bath vent covers
  • Including new attic ventilation as needed
  • Install self adhering modified bitumen roof system on the low slope cricket

**Clean-Up and Removal:** All waste materials will need to be discarded in a job site container or dumpster provided by the general Contractor. The job site will have a clean and organized appearance daily. The grounds will be swept with a magnet for optimal removal of nails and fasteners.

**Workmanship and Permit:** All work to be permitted then completed in a professional manner and in accordance with or above local and state building codes.  Workmanship is warranted for a period of three year from the date of completion, and only if paid for in full.

**Total cost of project - $19,800.00**
**Amount to be paid by the home owner, Betty Llanio - $14,010.00**
**Amount to be paid by the General Contractor, A.C.E. - $5,790.00**

*Note:  Miles Roofing Inc. takes no responsibility for identification or removal or disturbance of existing environmental problems or hazards.  If it is determined that any of the material or jobsites are an environmental hazard, the purchaser must arrange (at purchaser's sole additional expense) for removal, haul-away, dumping, and replacement of materials according to existing local, state, and federal law.*

*Note:  Miles Roofing Inc. takes no responsibility for existing damage to building or surrounding property.*

*Note:  Miles Roofing Inc. will remove/return any pre-existing non-roof related attachments (i.e. satellite dishes, gutters) to their original positions. Miles Roofing Inc. takes no responsibility for condition or damages that may occur to items.*

I/We the owners(s) of the premises described above offer to contract with Miles Roofing Inc. to furnish, deliver, and arrange for installation of all materials necessary according to the above specifications.  **I/We the purchaser(s) understand all terms and conditions stated above and agree to pay in full immediately upon completion of the roof installation of each separate building.**  Miles Roofing Inc. reserves the right to cancel any contract at any time.

Signature of Purchaser:_____    Date 2/7/08

Signature of Miles Roofing Inc. Rep.:_____    Date 01/07/08

**Miles Roofing Inc. FL LIC #: C-CC1326064**
51B0 Rishley Run Way
Mount Dora, FL 32757
Phone: 386-561 0616
Fax: 352-385-5117

**Proposal and Contract**
Name: Betty Llanio / A.C.E
Site Address: 1004 Oak Lane Apopka, FL 32703
Mailing Address:
Phone:

**Proposal and Contract for:** Furnish and installation of Metro, Roman Tile roof system

❖ **Scope of work includes:**

- Dry in roof with self adhering Polystick TU underlayment
- Install Meto brand Roman Tile metal stone coated roof shingles
- Including 26 ga. 2.5" painted eave drip
- Including new plumbing kitchen and bath vent covers
- Including new attic ventilation as needed
- Install self adhering modified bitumen roof system on the low slope cricket

**Clean-Up and Removal:** All waste materials will need to be discarded in a job site container or dumpster provided by the general contractor. The job site will have a clean and organized appearance daily. The grounds will be swept with a magnet for optimal removal of nails and fasteners.

**Workmanship and Permit:** All work to be permitted then completed in a professional manner and in accordance with or above local and state building codes. Workmanship is warranted for a period of three year from the date of completion, and only if paid for in full.

**Total cost of project - $19,800.00**
**Amount to be paid by the home owner, Betty Llanio - $13,800.00**
**Amount to be paid by the General Contractor, A.C.E. - $6,000.00**

*Note: Miles Roofing Inc. takes no responsibility for identification or removal or disturbance of existing environmental problems or hazards. If it is determined that any of the material or jobsites are an environmental hazard, the purchaser must arrange (at purchaser's sole additional expense) for removal, haul-away, dumping, and replacement of materials according to existing local, state, and federal law.*

*Note: Miles Roofing Inc. takes no responsibility for existing damage to building or surrounding property.*

*Note: Miles Roofing Inc. will remove/return any pre-existing non-roof related attachments (i.e. satellite dishes, gutters) to their original positions. Miles Roofing Inc. takes no responsibility for condition or damages that may occur to items.*

I/We the owners(s) of the premises described above offer to contract with Miles Roofing Inc. to furnish, deliver, and arrange for installation of all materials necessary according to the above specifications. **I/We the purchaser(s) understand all terms and conditions stated above and agree to pay in full immediately upon completion of the roof installation of each separate building.** Miles Roofing Inc. reserves the right to cancel any contract at any time.

Signature of Purchaser: _Betty Llanio (signature)_ Date _11-14-07_

Signature of Miles Roofing Inc. Rep.: _____ Date _11/12/07_